Wesley D. Hutchins, #6576
**THE HUTCHINS LAW FIRM, P.C.**
6751 South Adventure Way
West Jordan, Utah 84081
Telephone: (801) 969-0104
Fax: (801) 618-4251
E-Mail: wes@thehutchinslawfirm.com
***Attorney for Plaintiffs Robert Benito Manzanares***
         ***and K.M.***

---

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| ROBERT BENITO MANZANARES, personally and individually; and ROBERT BENITO MANZANARES for and on behalf of K.M., his Minor Child;<br><br>     Plaintiffs,<br><br>vs.<br><br>CARIE TERRY n/k/a CARIE MORELOCK; SCOTT BYINGTON;  JULISSA BYINGTON; WOOD CRAPO LLC; WOOD JENKINS LLC; KIRTON & MCCONKIE LLC; LARRY S. JENKINS; DAVID J. HARDY; and JOHN DOES I TO XX;<br><br>     Defendants. | **VERIFIED COMPLAINT**<br><br>**(Jury Demanded)**<br><br>Civil No.:<br><br>Judge: |

The above-captioned Plaintiffs complain and allege against Defendants as follows:

## PARTIES

1.      Plaintiff Robert Benito Manzanares ("Manzanares" or "Plaintiff") is a resident of

the State of New Mexico, and is the biological father of the Minor Child as hereinafter described.

2.      Plaintiff K.M. is the biological daughter of Plaintiff, born prematurely on February 17, 2008 (now nearly 6 years old)(hereinafter "Minor Child"), currently primarily residing in Utah.

3.      Defendant Carie Terry n/k/a Carie Morelock ("Morelock") is the biological mother of the Minor Child, and on information and belief is a resident of Colorado.

4.      Defendant Scott Byington ("S. Byington") is the biological brother of Morelock, husband of Defendant Julissa Byington, and is a resident of the State of Utah, and current adoptive father of the Minor Child.

5.      Defendant Julissa Byington ("J. Byington") is the wife of S. Byington and sister-in-law of Morelock, and is a resident of the State of Utah, and current adoptive mother of the Minor Child.

6.      Defendant Wood Crapo, LLC ("WC"), is/was a Utah limited liability company offering legal services, including but not limited to through attorney and shareholder Defendant Larry S. Jenkins, but on information and belief may now be dissolved and no longer in business.

7.      Defendant Wood Jenkins, LLC ("WJ"), is/was a Utah limited liability company offering legal services, including but not limited to through attorney and shareholder Defendant Larry S. Jenkins, but on information and belief may now be dissolved and no longer in business.

8.      Defendant Kirton & McConkie, LLC ("KMLF" for "Kirton McConkie Law Firm"), is currently a Utah limited liability company offering legal services, including but not

limited to, through attorneys and shareholders Defendant Larry S. Jenkins and Defendant David J. Hardy.

9.      Defendant Larry S. Jenkins ("Jenkins"), is a Utah licensed attorney, practicing law and residing within the State of Utah, and was at all relevant times a shareholder in WC, WJ, and now KMLF, and further at all relevant times was providing legal representation for S. Byington and J. Byington, and at times directly or indirectly to Morelock.

10.     Defendant David J. Hardy ("Hardy"), is a Utah licensed attorney, practicing law and residing within the State of Utah, and was at all relevant times a shareholder in KMLF, and further at all relevant times was providing legal representation to Morelock and/or to Byingtons.[1]

11.     Defendant John Does I to XX are individuals and/or business entities, whose identities and/or involvement in the underlying circumstances of this care are not sufficiently known at this time, however, once said information becomes available to Plaintiffs in this case, they reserve the right to amend this Verified Complaint to name each as additional parties and/or bring additional causes of action against presently-captioned Defendants and the John Does.

## JURISDICTION

12.     This Court has federal question jurisdiction over this matter based upon RICO, 18 U.S.C. § 1961, et. seq., consistent with 28 U.S.C. § 1331 and 28 U.S.C. § 1337; this Court also

---

[1]Other attorneys working for and on behalf of one or more of the Defendants, and/or associated with one or more of the named law firm Defendants, may be added as additional parties in the future, following the completion of some discovery. The presently named Defendants, however, are the ones who were/are on information and belief principally involved with adoption matters specifically related to this case and other adoption matters generally.

has jurisdiction under federal question jurisdiction, 18 U.S.C. § 1982 (property rights of citizens). The Court also has jurisdiction as a result of diversity of citizenship and the amount in controversy, 28 U.S.C. § 1332.  Finally, the Court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1367 arising out of Utah state law.

## VENUE

13.     Venue is proper in this Court based upon the statutory provisions cited in the preceding paragraph, and further based upon 28 U.S.C. § 1391(b) and upon 18 U.S.C. § 1965(b).

## NATURE OF THIS CASE

14.     This is a clear cut case of an illegal fraud-ridden infant adoption being accomplished through the deceptive and clandestine conduct of the Defendants acting individually and through the collective efforts of other Defendants.  Defendants essentially kidnapped the Minor Child from Manzanares.  Fortunately, the Utah Supreme Court recognized the Defendants' deplorable conduct as unlawful and even fraudulent, and reversed the trial court's refusal to dissolve the illegal adoption Defendants had secured through their wrongful conduct.  As a direct and proximate result, Manzanares and his daughter, the Minor Child, have incurred injuries and damages that are extensive and outlined more fully below, including but not limited to: extensive damages to their property; loss of the parent-child relationship and association (for at least the first several years of the Minor Child's life, and possibly continuing into the future); emotional, mental, and even physical pain, suffering, and distress; attorney fees; costs of litigation; therapy and counseling expenses; travel, lodging, and meal expenses; punitive

4

or exemplary damages; and other injuries and damages that will be further presented at the time of a trial of this matter.  As a result of Defendants' reprehensible and illegal conduct, Plaintiffs have incurred extensive damages in a total sum that will be determined at the time of trial, but which shall in no way be less than $120 million.

## GENERAL STATEMENTS OF FACT

### *Procedural Facts Involving Colorado and Utah Court Actions*

15.     On or about January 16, 2008, more than one (1) month prior to the birth of the Minor Child on February 17, 2008, Manzanares filed a Verified Petition for Paternity and Enjoin Adoption in Denver County, State of Colorado (hereinafter "Paternity Action"), which included, as the caption stated, a request to enjoin any adoption proceeding.

16.     Morelock was served with the Paternity Action on February 1, 2008, more than two (2) weeks prior to the pre-mature birth of the Minor Child.

17.     Morelock filed a Reply to the Paternity Action on or about February 12, 2008, approximately five (5) days prior to the pre-mature birth of the Minor Child.  Among other things, in Morelock's Reply, she denied Manzanares' belief that she intended to surreptitiously give the Minor Child up for adoption in Utah, and further requested that the Colorado court to "allow adoption proceedings" in Colorado "upon [the] baby's birth for the best interest of the baby."

18.     A hearing on Manzanares' Paternity action in Colorado was scheduled for February 20, 2008 at 9:00 a.m.– a hearing for which Morelock received notice.

19.     On February 14, 2008, Morelock purposely fled the jurisdiction of Colorado in an effort to prevent Manzanares from exercising any of his paternity rights, and did so without disclosing her true intentions to Manzanares.

20.     Morelock fled the jurisdiction of Colorado under the false pretenses of visiting her ill father, when at all times her true motives were an effort to prevent Manzanares from exercising any of his paternity rights.

21.     As set forth above, the Minor Child was born prematurely, in Utah, on February 17, 2008.

22.     In the morning of February 20, 2008, Morelock called the Court in Denver County, State of Colorado and indicated that she would not be at the hearing that morning because she was out of town visiting an ill relative.

23.     As of February 20, 2008 (and earlier), Morelock was receiving legal advice from Jenkins and/or Hardy.

24.     Morelock did not inform the Colorado Court or Manzanares in the 2/20/2008 telephone call that she had already given birth to the Minor, nor did she inform the Colorado Court that she was appearing before Judge Hilder in the Utah Court at 8:45 a.m. (that very same morning) to give her consent to adoption of the Minor Child by the Byingtons.

25.     Morelock, on the advice and counsel of Jenkins and/or Hardy, engaged in such non-disclosures knowingly and intentionally in order to deceive Manzanares and the Colorado Court.

26.     On February 20, 2008, at approximately 8:45 a.m., just fifteen (15) minutes before the Colorado Court was to hold the hearing on Manzanares' Paternity Action, Morelock executed before Judge Hilder a document in Utah Court entitled "[Morelock's] Consent to Adoption."   A true and correct copy of "Consent to Adoption" is attached hereto as Exhibit A.

27.     Morelock signed the Consent without disclosing to the Utah Court that there was already a paternity action pending in Colorado, without disclosing she had just called the Colorado Court and claimed she could not be there because she was visiting an ill relative in Utah.

28.     Morelock has self-servingly claimed that her refusal and failure to disclose such things to the Utah Court "didn't matter."

29.     Morelock's claim that her refusal and failure to disclose such things to the Utah Court "didn't matter" was based at least in part on advice and counsel she received from Jenkins and/or Hardy, given to Morelock in an effort to advance the Defendants' scheme to defraud Manzanares.

30.     Also on February 20, 2008, Judge Hilder of the Third District Court, County of Salt Lake, State of Utah, entered an Order of Temporary Custody to Morelock's brother and sister-in-law, S. Byington and J. Byington.  A true and correct copy of the Order of Temporary Custody is attached hereto as Exhibit B.

31.     Consistent with Morelock's conduct, S. Byington and J. Byington also negligently and/or intentionally failed to disclose material information to Manzanares about their plans to

adopt the Minor Child.  Though they were believed to be present at the signing of Morelock's Consent and the Temporary Custody Order before Judge Hilder, Byingtons also stood by silent about all events that were going on in Colorado, knowing of Morelock's misrepresentations to the Colorado Court, thereby failing and refusing to disclose any such facts and circumstances to the Utah Court, all in an effort to further advance Defendants' scheme to defraud Manzanares and the Courts.

32.     Jenkins and/or Hardy, and/or other attorneys appearing in Court before Judge Hilder and/or who had filed documents to the Utah Court, though officers of the Court and contrary to rules of ethics and established law, also stood by silent about all events that were going on in Colorado, knowing of Morelock's misrepresentations to the Colorado Court, thereby failing and refusing to disclose any such facts and circumstances to the Utah Court, all in an effort to further advance Defendants' scheme to defraud Manzanares and the Courts.

33.     Manzanares first became aware on approximately February 25, 2008 that his Minor Child had been born, which awareness came not from Morelock, Byingtons, or anyone representing them, but rather from a co-worker of Morelock who indicated to Manzanares that his Minor Child had been born – further evidencing the Defendants' efforts to keep the fact of the Minor Child's birth concealed from Manzanares as long as possible.

34.     On February 26, 2008, Manzanares filed an Emergency Motion with the Colorado Court, for which hearings were scheduled and conducted on February 27, 2008, and February 29, 2008.  Morelock received notice of these proceedings as well.

35.     On February 29, 2008, the Denver County District Court entered an Order addressing paternity, as well as the rights and responsibilities of Manzanares and jurisdictional issues.  The Colorado Court also required that Manzanares' name was to be listed on the Minor Child's birth certificate as the father – when the Minor Child was born.

36.     Additionally, another hearing was conducted by the Denver County District Court on March 3, 2008, and the Court issued a supplemental Order addressing venue and jurisdiction for the Paternity Action.

37.     During the Colorado Court Hearing on March 3, 2008, the Colorado Court conferred on the record with the Utah Court, specifically the Honorable Robert K. Hilder, Third District Court, Salt Lake County, State of Utah.

38.     S. Byington and J. Byington (jointly and severally "Byingtons") sought to adopt the Minor Child by signing a Petition for Adoption on February 16, 2008 ("Adoption Action"), the day before she was born, and five (5) days after Morelock ostensibly (and fraudulently) came to Utah to visit her ill relative.

39.     Hurriedly, the Adoption Petition was filed in Utah on February 19, 2008, and at that time Morelock's relinquishment hearing was scheduled for the next day, February 20, 2008.

40.     None of these events were disclosed to Manzanares at or about the time they occurred, but were rather purposely and knowingly kept from his knowledge in an effort to deceive him and prevent him from more timely taking further action in Utah and/or Colorado.

41.     There was a wide variety of filings and actions taken in the Adoption Action in

Utah, culminating with a Utah Supreme Court decision reversing the Utah District Court decision that went against Manzanares.  *See In re Baby B,* 270 P.3d 486 (Utah 2012).[2]

### *Background Facts*

42.     Manzanares and Morelock carried on an intimate relationship with one another in Denver County, State of Colorado, resulting in the conception of the Minor Child, at issue in this case.

43.     Manzanares engaged in regular communication with Morelock regarding her welfare, and the welfare of the Minor Child, who was yet to be born.

44.     Manzanares provided financial support to Morelock during the pregnancy and after the birth of their daughter, the Minor Child.  Furthermore, even though Manzanares offered additional assistance, Morelock did not request or accept any additional assistance.

45.     Morelock attempted to pressure Manzanares into consenting to the placement of the Minor Child for adoption, including Morelock having a Colorado LDS Family Services adoption agency contact Manzanares in November 2007 requesting that he sign papers permitting the adoption of the Minor Child to go forward.

46.     Manzanares' attorney in Colorado responded to the adoption agency, and communicated that Manzanares would not consent to the adoption of his Minor Child.

47.     Court proceedings are discussed more fully below, however, in response to

_____

[2]Interestingly, though it is a split 3-2 decision, even the dissenting Justices in the case acknowledged that the wrongful conduct of the birth mother in the case was fraudulent and outrageous.  *See In re Baby B; Manzanares v. Byington*, 2012 UT ¶¶ 94 (Utah 2012).

Manzanares' Colorado Paternity Action, Morelock admitted that Manzanares is the biological

father of their Minor Child.

48.     On January 11, 2008, Morelock e-mailed Manzanares, and stated in pertinent part

as follows:

> I will be flying to Utah to visit my father in Feb for a week (maybe a little
> longer, it depends on how he/things are).  Then it will be back to work to finish up
> the club's construction before I take time off at the end of March. . . in April I will
> be willing to sit down and talk with you about your reconsideration to consent for
> adoption otherwise this will be a long process and it will benefit no one,
> especially this baby.

(Hereinafter "January Email").  A true and correct copy of the January Email is attached hereto as

Exhibit C.

49.     Morelock never told Manzanares that she was coming to Utah with the actual

intent to give birth to their Minor Child, and to place her for adoption, without Manzanares'

knowledge and/or consent.  In fact, Morelock viewed Manzanares as nothing more than a

"chromosome donor."

50.     In or about November 2007, approximately three (3) month or more before the

birth of the Minor Child, Morelock retained and/or consulted with Jenkins and/or Hardy as legal

counsel, and maintained an attorney-client and/or other consulting relationship him/them through

issuance of the Supreme Court decision on January 27, 2012, remand proceedings conducted

thereafter, and on information and belief up to the present time pertaining to custody proceedings

in Colorado.

51.     In the same time frame, November 2007, Morelock formed an intention to place

the Minor Child for adoption with her brother and sister-in-law, the Byingtons.  More specifically, her consultation with Jenkins involved, but was not necessarily limited to, Morelock asking him for advice regarding adoption laws in Utah, and how she could unilaterally eliminate Manzanares from being involved in the life of his Minor Child.

52.     In or about as early as November 2007, or as late as approximately January/February, 2008, Byingtons also retained and/or consulted with Jenkins and/or Hardy as legal counsel, and maintained an attorney-client and/or other consulting relationship with him/them through issuance of the Supreme Court decision on January 27, 2012, remand proceedings conducted thereafter, and on information and belief up to the present time pertaining to custody proceedings in Colorado.

53.     Hardy and Jenkins have had a long-term professional relationship, including but not limited to referring cases back and forth, and very often being involved in the same adoption matters with one representing the prospective adoptive parents and/or adoption agency, and the other representing one or more of the biological parents, usually the birth mother.

54.     This relationship maintained between Hardy and Jenkins, from at least January 2005 (if not earlier) to the present, included a close referral relationship, and further a close adoption business associate relationship, understanding each other's policies, procedures, and/or opinions relating to birth father's rights, Fraud Immunity in Utah (see footnote 3 below), and methods used to provide just enough information to trigger qualifying circumstances under Utah's putative father requirements, but knowingly and purposefully avoiding giving birth

fathers any meaningful notice of adoption plans to be knowingly and intentionally carried out in Utah without obtaining the birth father's consent or providing him with any meaningful notice of adoption plans.

55.     Hardy and Jenkins are now at the same law firm, KMLF, and are even more intimately involved in implementing and advancing adoption-related policies and procedures, including maintaining the status quo with regard to Utah's Fraud Immunity,[3] and in some cases advancing, preserving, protecting, and perpetuating other adoptive placements even though they were first achieved through fraudulent conduct.[4]

56.     On information and belief, Jenkins joined KMLF in or about late 2010 or in

_____

    [3]Under Utah Code Ann. § 78B-6-106, an adoption my be accomplished through fraud, however, fraud expressly may not be a basis to undo a fraudulent adoption.  This statute, and the incentive that it creates for some to engage in fraud in adoption scenarios is referred to hereinafter as "Fraud Immunity."

    [4]As just two examples there is the case of birth father Jake Strickland at one time being briefed to the Utah Court of Appeals (Appellate Case No. 20130088)(now certified to the Utah Supreme Court), and the case of birth father Jacob Brooks, on which briefing to the Utah Court of Appeals has been completed (Appellate Case No. 20120683), and the Utah Court of Appeals has now certified to the Utah Supreme Court (scheduled for oral argument on March 4, 2014). Hardy and/or Jenkins have also been personally involved with a myriad of other reported appellate decisions involving adoption/fraud issues, including but not limited to: *Osborne v. Adoption Center of Choice*, 70 P.3d 58 (Utah 2003); *Thurnwald v. A.E.*, 2007 UT 38, 163 P.3d 623 (Utah 2007); *In re Adoption of Baby Boy Doe, N.T. v. Jane Doe*, 199 P.3d 368 (Utah App. 2008); *Rowe v. Baird and LDS Family Services,* 2009 UT App 24 (Utah App. 2009); *O'Dea v. Olea*, 217 P.3d 704 (Utah 2009); *In re Adoption of T.B.*, 2010 UT 42 (Utah 2010); *In re Baby E.Z.*, 2011 UT 38 (Utah 2011); *Manzanares v. Byington (In re Baby B)*, 270 P.3d 486 (Utah 2012)(the published appellate decision in this case); *In re Baby Girl T.*, 2012 UT 78 (Utah App. 2012)*(aka "Ramsey Shaud").*

2011.[5]

57.     In at least one reported appellate decision, the well-publicized John Wyatt case, Jenkins was found to have been directly involved in a fraudulent scheme to place Baby Emma for adoption over the birth father, John Wyatt's, clear objections.  *See* Virginia Supreme Court decision in *John M. Wyatt III, et al. v. McDermott, et al.,* ***283 Va. 685***; ***725 S.E.2d 555***; ***2012 Va. LEXIS 92***.

58.     The Virginia Court, dealing with similar acts of fraud, misrepresentation, and concealment/omission, concluded:

> [i]t is both astonishing and profoundly disturbing that in this case, a biological mother and her parents, with the aid of two licensed attorneys [one of which was Jenkins] and an adoption agency, could intentionally act to prevent a biological father -- who is in no way alleged to be an unfit parent -- from legally establishing his parental rights in gaining custody of a child whom the mother did not want to keep. . . .

59.     Utah's pro-adoption and anti-birth father laws, facilitated through Fraud Immunity, have given rise to a greater number of out-of-state birth mothers forum shopping Utah, and through their own efforts, aided by legal counsel, and in some cases by the prospective adoptive parents, they have been able to successfully place their babies for adoption through misrepresentation and fraud -- keeping biological fathers in the dark through the process.

60.     Such adoption schemes have become precisely what Chief Justice Durham voiced

---

[5]Regardless of the time Jenkins formally joined KMLF, on information and belief, negotiations leading up to him actually becoming employed by, and a shareholder with KMLF, took place over a period of several weeks and possibly months.

as a concern when she stated it is doubtful that the legislature intended residency requirements to be interpreted so broadly in Utah (e.g. a 1 or 2 day stay to give birth), that Utah would "become a magnet" for birth mothers to come here, for a very  limited period of time and for the sole purpose of giving birth to a child, relinquishing their rights, and then returning to their home state.  *O'Dea v. Olea*, 217 P.3d 704, 715 (Utah 2009)(Durham, C.J., dissenting).

61.      KMLF is, for all relevant purposes in this lawsuit, the law firm for the Church of Jesus Christ of Latter-day Saints ("LDS Church"), and thus consistently represents, advances, and advocates the interests of the LDS Church, including its apparent stance on adoption laws in Utah that are, to say the least, unfriendly to unmarried biological fathers like Manzanares.

62.      As one example, LDS Family Services, the adoption agency for the LDS Church, through attorney David M. McConkie as "Group Manager for Services to Children" explained to the mother of Jake Strickland (case on appeal, cited above), that at least in part the laws are set up the way they are in Utah to find a "best solution to the challenge of out of wedlock pregnancies, and in support thereof quotes from the LDS Church's "The Family: A Proclamation to the World" in which the LDS Church states in part:

> . . . the means by which mortal life is created [is] divinely appointed.  We affirm the sanctity of life and of its importance in God's eternal plan . . . . The family is ordained of God.  Marriage between man and woman is essential to His eternal plan.  Children are entitled to birth within the bonds of matrimony, and to be reared by a father and a mother who honor marital vows with complete fidelity.

*See* true and correct copy of Letter attached hereto as Exhibit  D.

63.      In addition, as the Utah Court pleadings in the underlying pleadings in this case

confirm, David M. McConkie is listed as co-counsel with Hardy.

64.     On information and belief, McConkie is also a shareholder at KMLF.

65.     Under Utah law, lies, misrepresentations (by affirmative falsehood or by omission/concealment), misstatements of fact, and fraud, are not grounds for reversing an adoption that is accomplished through such means, although civil actions for money damages are expressly permitted in accordance with existing law. *See* Utah Code Ann. § 78B-6-106 (as defined above, hereinafter "Fraud Immunity" or "Fraud Immunity Statute").

66.     Hardy and/or Jenkins counseled, advised, and/or gave information to Morelock and/or Byingtons (for as many and three (3) months) before and/or after the January Email regarding the Fraud Immunity Statute, Fraud Immunity in general, and other laws governing a putative father's full and strict compliance obligations in Utah, as well as a biological father's short time-frames for accomplishing same.

67.     Hardy and/or Jenkins, in a coordinated effort, encouraged Morelock to draft the January Email, in an effort to trigger a "qualifying circumstance" which would have ostensibly required Manzanares to fully and strictly comply with Utah's laws governing establishment of his paternity rights, even though he may have already filed for paternity in Colorado.[6]

68.     Hardy and/or Jenkins, in a coordinated effort, encouraged Morelock to leave out

---

[6]Under Utah Code Ann. Section 78B-6-122(1)( c)(ii)(B)(I)-(II) Manzanares had until the later of 20 days after the day he "knew, or through the exercise of reasonable diligence should have known, that a qualifying circumstance existed.... or the time that [Morelock] executed a consent to adoption or relinquishment of the child for adoption."

certain facts regarding her true intentions regarding coming to Utah, including but not limited to her intention of coming to Utah to give birth to the Minor Child and place her for adoption without Manzanares' knowledge and/or consent.

69.     Morelock also fraudulently concealed facts, and affirmatively misrepresented her intentions, by attempting to place the Minor Child for adoption with her brother and sister-in-law, the Byingtons, as a means of remaining involved in the Minor Child's life while wrongfully attempting to prevent Manzanares from having the same opportunity.

70.     Hardy and/or Jenkins used, in concert with their clients, the January Email, and Fraud Immunity, as a basis to have Manzanares' paternity rights terminated, and/or to have his efforts to assert his paternity rights in both Utah and Colorado dismissed, thus aiding and further facilitating Morelock's and Byingtons' fraudulent conduct.  *See* pleadings in Utah and Colorado proceedings, and letter from Jenkins to Manzanares' then Colorado counsel dated 2/25/2008, attached hereto as Exhibit E (hereinafter "Jenkins' Letter").

71.     Hardy and/or Jenkins failed to disclose, and caused their respective clients not to disclose, at a variety of times in both the Colorado and Utah proceedings, what was happening respectively in the other state, all in an effort to keep both the courts and Manzanares in the dark as to what was really happening.

72.     Jenkins' Letter suggests that the premature birth of the Minor Child was accidental, when in fact, Morelock was medically induced to go into premature labor, and consequently the Minor Child suffered serious medical complications, ending up in an ICU, all

17

as part of the Defendants' scheme to defraud Manzanares out of his paternity rights.

73.     Morelock began putting an adoption plan in place, that involved her giving birth in Utah, as early as November 2007.

74.     Morelock discussed specifics of her birth and adoption plan in Utah with third parties, including her work supervisor, but not with Manzanares.

75.     Morelock had opportunities to disclose much information about her plans (e.g. selection of midwife, doctor, and hospital) but she purposely and fraudulently chose not to give Manzanares that information.

76.     Byingtons had numerous opportunities to come forward and disclose what the Defendants were attempting to accomplish, but they intentionally and/or negligently failed and refused to do so.

77.     Jenkins and Hardy had numerous opportunities, as officers of the Court, to refuse representation of Morelock and Byingtons and/or to withdraw as legal counsel, thus refusing to become parties to the Defendants' scheme to defraud Manzanares.

78.     Jenkins and Hardy also had numerous opportunities to come forward and disclose what the Defendants were attempting to accomplish, but they intentionally and/or negligently failed and refused to do so.

79.     On information and belief, Jenkins and/or Hardy knew the true facts relating to the birth of the Minor Child, and they knew the other Defendants' intentions to defraud Manzanares, and both made affirmative misstatements of fact and omissions of material fact

18

regarding same in a concerted effort to assist Defendants in achieving the adoptive placement of the Minor Child contrary to the rights and stated desires of Manzanares.

80.     By continuing to represent Defendants in a variety of legal actions, both in Utah and indirectly in Colorado, individually and in some instances in concert with Colorado legal counsel, Hardy and Jenkins continued to aid, abet, promote, participate in, perpetuate and advance the fraudulent conduct of themselves and their clients.

81.     In addition, on February 25, 2008, Manzanares called and spoke to Byingtons, and inquired where his Minor Child was.

82.     S. Byington fraudulently concealed the fact that an adoption petition had already been filed, and that Morelock had given her consent for the Byingtons to adopt Manzanares' Minor Child.  S. Byington only told Manzanares that he would be contacted by legal counsel.

***Hardy and Jenkin's Association with Agencies and Individuals Encouraging Fraudulent Conduct***

83.     Hardy and Jenkins have associated, represented, and conspired with numerous adoption agencies and individuals operating in Utah and other states, which have actively engaged in and encouraged fraudulent conduct by birth mothers, and in some instances on information and belief, prospective adoptive parents as well.

84.     Hardy represents a variety of adoption agencies, but principally LDS Family Services.  LDS Family Services, through a Colorado office, is the adoption agency that first communicated with Manzanares and requested that he consent to an adoption, and he refused to do so, including communicating his refusal through legal counsel in Colorado.

19

85.    Jenkins has represented, at one time or another, virtually every major adoption agency in Utah, including Guardian Angel, A Act of Love, Heart to Heart, Heart and Soul, Adoption Center of Choice ("ACC"), and many others.

86.    Hardy and Jenkins exert considerable influence and control over many adoption agencies in, and individuals involved with adoption in Utah, through their positions with (past and present) and their association with a variety of adoption trade organizations (e.g. the Utah Adoption Council, American Academy of Adoption Attorneys,[7] LDS Family Services agencies, groups, and committees), and through rendering opinions regarding their policies and procedures, many of which are based upon Fraud Immunity in Utah.[8]

87.    Hardy and Jenkins teach and inform agencies and individuals that misrepresentation and fraud are not a valid basis to overturn an adoption which in turn has

---

[7]Donald Cofsky is the current President of the American Academy of Adoption Attorneys ("AAAA").  He has recently indicated that he is aware of adoption laws in Utah, and though not speaking on behalf of AAAA, he personally believes Utah's laws that are so unfriendly to biological fathers are "horrible" and "terrible."  AAAA is a trade organization of approximately 340 adoption attorneys throughout the United States and Canada.  A true and correct copy of various pages from the AAAA website are attached hereto as Exhibit O.

[8]Interestingly, Jenkins and/or Hardy have publicly stated on numerous occasions, that the agencies they represent do not engage in birth father fraud, and that their agencies are in compliance with adoption agency best standards and practices, including those set forth as Exhibit M hereto, previously held out by the Utah Adoption Council ("UAC") as adoption agency best standards and practices in Utah.  Even more interestingly, as November 26, 2013 (and thereafter), and on information and belief after an adoption agency's (a member of UAC) actual wrongful conduct was brought to UAC's attention, and that member agencies were not following UAC's professed best standards and practices, they were removed from UAC's web site.  *See* Exhibit N.

incentivized agencies to encourage out-of-state birth mothers to forum shop Utah because of its comparatively anti-birth father laws, financial incentives agencies/adopting parents can pay to birth mothers, and the relative ease with which the paternity rights of unmarried biological fathers can be terminated in Utah without any notice to or consent from such fathers who have never even been to Utah.

***Evidence of Forum Shopping Encouraged by Utah Adoption Agencies, Including ACC.***

88.  Utah adoption agencies, including but not limited to those represented and assisted by Hardy and Jenkins, regularly coach birth mothers on issues that entice them to come to Utah to have their babies.

89.    Such agencies encourage mothers to forum shop Utah, in direct contradiction to the rights a birth father would have in his home state.

90.    Stacy Ellstawary ("Ellstawary"), who works for a Pennsylvania state representative, took personal interest in an unrelated unmarried biological father case, as he tried to get anyone to listen to him and assist in getting his child back.  Ellstawary called ACC in late 2010, and inquired about placement of children for adoption when the birth mother is from out of state, and does not want the birth father involved.

91.    ACC stated that if a birth mother claimed there was physical abuse from the birth father, then he would be cut off from his rights automatically.

92.    ACC also expressly told Ellstawary that there are "ways to get around the birth father."

93.    ACC went on to indicate that there were ways to sequester the birth mother from the birth father so that "he would never have a shot in hell in ever getting his child back."  *See* Exhibit F.

**March 25, 2011 Interview of ACC.**

94.    On March 25, 2011, a telephone interview of an individual named Allison with ACC was conducted regarding agency policies and procedures pertaining to out-of-state birth mothers who wish to come to Utah to give birth.  Issues discussed focused on monies paid to such birth mothers and other accommodations gifted to the mother, as well as procedures for cutting the birth father out of the parenting picture. *See* Exhibit G.

95.    The transcript of the 3/25/2011 interview provides substantial evidence of ACC's unlawful policies and procedures regarding out-of-state birth mother adoption cases similar to this one, to wit, unmarried biological mothers not from this state, are brought into Utah for the purpose of giving birth, placing the child for adoption, without any notice to the birth father, and then returning the birth mother to her home state (Exhibit G):[9]

---

[9]This adoption "scheme" is precisely, as set forth above, the concern voiced by Chief Justice Durham when she stated it is doubtful that the legislature intended residency requirements to be interpreted so broadly in Utah that the state would become a magnet for birth mothers to come here, for a very  limited period of time and for the sole purpose of giving birth to a child, relinquishing their rights, and then returning to their home state. *O'Dea v. Olea*, 217 P.3d 704, 715 (Utah 2009)(Durham, C.J., dissenting).   The transcript of the ACC interview, as well as the other interviews with adoption agencies, discussed more fully below, demonstrate that Chief Justice Durham's concern has become a reality.

a.  Birth mother from Maryland "just wants to disappear;" R. 176[10];

b.  The agency has a housing program in Utah, cable tv, utilities, but we would need to grab one of the apartments if the birth mother is serious; R. 175;

c.  If birth mother comes to Utah then [agency] can go by Utah law and [agency] can give her way more assistance, including post placement money; R. 174;

d.  It's kinda recovery money; not for the baby but for the birth mother to recover from having the baby; that amount could be anywhere from $2,000 to $4,000; it's probably closer to $3,000 to $4,000; R. 174;

e.  In Maryland an agency can't give post placement money; they don't allow us to give cash like that; R. 174;

f.  Once we give them that cash here in Utah they can spend that money any way they see fit; once we give her that money nobody is going to check up and say how did you spend that money; we're regulated by how much we can give her like by rent, transportation, utilities, counseling, and things like that which is how we come up with the amount; R. 173;

g.  Travel is all paid for; R. 173;

h.  We give her a weekly assistance, and birth moms come in and say, "I've never had to have this much money to even eat...they have so much money to get by on"; R. 173;

I.  Utah is one of the better states to work with birth moms regarding the unmarried biological fathers ("UBFs"); there are steps they have to take care of in Utah to be

---

[10]Represents the page number of Exhibit G.

considered a parent and 99% of the guys don't even do it; they throw a little fit and act like they

will, but then they don't; R. 172;

       j.  There is a notification process if she doesn't want to name him on any

paperwork she just doesn't put his name on any of it; lawyers take care of the notification; R.

172;

       k.  So she doesn't have to do anything; "Unfortunately, for the guys, that really

maybe is not completely fair, but it is Utah law." R. 171;

       l.  The birth mom doesn't have to tell the UBF she is coming here; she's not

married to him so she has no binding obligation to tell him where she is going; R. 171;

       m.  We do have to publish [later says doesn't have to publish], if he's aware to

look at publications of babies being born and can come in and throw a fit but it's rare that a dad

actually does that; R. 171;

       n.  Birth mom wants to just cut UBF out altogether, and wants to know what to

expect if he finds out she is in Utah; [interviewer is put on hold so Allison can ask someone that

"knows the laws pretty good"]; R. 170;

       o.  He doesn't know she is coming to Utah, or that she is even thinking about it;

"She needs to keep that a secret from friends, everybody!"  "If that leaks out he's going to find

her." R. 170;

       p.  "So what she needs to do is just be nonchalant, finish out her quarter [in

school] there, and umm just kinda like well I'm going to go visit someone, I mean not really tell

anybody, but you know like I'll be back for the next quarter or whatever, and then it just won't look that suspicious to friends and then if he's looking for her, he won't know where she went." R. 170;

       q.  [Allison then checks to see where they publish notice]; they will publish in Maryland, and the person asked said they never hear from the UBFs, so the birth mother "is probably pretty safe." R. 169;

       r.  The UBF might be operating under Maryland law, and he wouldn't even know to go by Utah laws; R. 169;

       s.  "She said we never ever hear from them off of a publication, but she says we legally have to do that." R. 169;

       t.  If the birth mother comes to Utah then we use our attorney; R. 168;

       u.  "We've had some birth fathers blowing some huge smoke and we thought, oh my gosh this is never going to fly and then they go away."  It's very expensive for them. R. 168;

       v.  The UBF won't know she's in Utah; R. 168;

       w.  Even if he got to Utah he wouldn't know how to find her; R. 167;

       x.  Even if the birth mother comes to Utah until she has the baby, and even though she's not a resident here, just staying here, he still has to comply with Utah law and not Maryland law; R. 168;

       y.  If she's here in Utah placing the baby then we go by Utah law; R. 166;

       z.  There are several steps he has to take and it is kind of expensive; they start

realizing how much it is going to cost; only ones that follow through with it do so because of their parents' money, and that's actually quite rare; Utah law is what is applicable; R. 166;

aa.  Better for her to come to Utah, and he would have to do the research and have to make the effort to find out he has to comply with Utah law; R. 166;

bb.  Had a dad come back and call the office all the time; he called and called and finally he just went away; R. 164;

cc.  "So it sounds really unfair for these dads but he did not take the steps that he needed to take beforehand and we don't give out that information, it's private in the laws."  R. 164;

dd.  This one guy called pretty frequently and we thought it was going to be a disaster, but he did just disappear and the adoption took place and everything was fine; [The individual that was calling the agency is believed the UBF in the other case]; R. 164;

ee.  Yeah, hopefully he never figures out where she goes, if she just disappears he won't look for her; R. 164;

ff.  He has to follow certain guidelines to even have a fighting chance; R. 164;

gg.  He has to prove some things, and usually once it reaches the point that the baby has been born, there's going to be enough time between her moving and her having the baby, if he's going to throw a fit we're going to see it; R. 163.

### March 10, 2012 Interview of ACC.

96.    On or about March 10, 2012, another interview of another representative of ACC

26

(or "Agency") was completed by a woman posing as a birth mother from Illinois. The additional interview confirms all of the following forum shopping and other wrongful conduct by ACC (Exhibits H and I):

        a.     The birth father wanted to get married and raise the baby together with the birth mother.  (Ex. H at 3:19-21);

        b.     "In Utah the birth father laws are very unforgiving."  (Ex. H at 5:22-23);

        c.     "If he [the birth father] knows that you are in Utah, that's really ideal.  If he is noticed and served, that helps.  But you don't have to even identify him."  (Ex. H at 5:22-23);

        d.     If the birth mother comes to Utah and has baby and then returns home (to Chicago) and she's not pregnant anymore, the birth father will be mad.  (Ex. H at 7:8-12);

        e.     "You don't have to tell [the birth father] anything," you can say "Hey, you know, we had a really bad accident."  (Ex. H at 7:13-17);

        f.     "You can tell the birthfather whatever you want," including that you "got into a car accident" and the baby died, "that might be easier. . .".  (Ex. H at 7:18-21; Ex. I);

        g.     Adoption Center will support you if you need it, including you getting out of Illinois and moving back to Utah.  (Ex. H at 7:21-24);

        h.     "You have to come here to have the baby."  (Ex. H at 9:14-15);

        I.     "There is no other way out.  If you're going to go somewhere, this is the best place."  (Ex. H at 9:17-19);

j.      "Utah law allows for the [adoptive] family to provide you with what's called post placement support, which is an attempt to replace your income or what would have been your income for about four to six weeks."  (Ex. H at 10:20-24);

k.      "It usually ends up being, you know, 3- to $4,000."  (Ex. H at 11:1-2);

l.      "Not all states allow birth moms money or hardly any at all or they have a cap on it.  Utah doesn't.  It just has to be reasonable."  (Ex. H at 11:11-13);

m.      "We [Adoption Center] work with families all over the country.  Because Utah's so adoption friendly a lot of families want to adopt out of Utah.  Because if the child is born here and placed here, Utah law applies."  (Ex. H at 12:9-13);

n.      "I've [Adoption Center] never seen it work" if you deliver in Utah and he is in Illinois.  (Ex. H at 13:11-15);

o.      "[T]here's a lot going on right now, a lot of pressure in Utah to change the adoption laws for this very reason because they seem very unfair.  In my opinion, it is unfair.  Legal doesn't make it right, but that's the law.  So as long as that's the law, you're protected."  (Ex. H at 13:17-23);

p.      "[I]f he were my son, I'd be saying `That is not right.  That is unfair.'  Because it is unfair.  But Utah says you have sex, you better figure out there could be a baby, and that means in nine months you better do something.  And if you don't, too bad."  (Ex. H at 13: 25 to 14:5);

q.      You can fly to Utah whenever you want, but you'd want to make sure

28

you're safe; we have women fly out right at their due date, but it's really not advisable.   (Ex. H at 14:12-13, 24-25 to 15:1);

r.       The sooner you can get to Utah the better; "If you wanted to come out here and find a place and get into a place, we'd pay your rent and utilities." (Ex. H at 16:2-7);

s.       "We'd give you grocery money every week.  You could get on Utah Medicaid...." (Ex. H at 16:11-13);

t.       "I've been a social worker for 30 years."  (Ex. H at 22:20-21);

u.       "I've been at [Adoption Center] for 11 [years]..."  (Ex. H at 22:23);

v.       "[T]he question that I need to answer for you is how much of a complicating factor could the birth father be if you come to Utah."  (Ex. H at 23:19-22);

w.       He doesn't know he has 20 days [from a qualifying circumstance], "[h]e's supposed to figure all of that out.  Utah says you [the birth father] should figure it out.  You're a big boy, you've been dating, figure it out."  (Ex. H at 23:23 to 24:3);

x.       If you [the birth mother] disappeared he [the birth father] would probably think you came to Utah.  (Ex. H at 24:10-12);

y.       If the birth father found out you lied to him and you actually gave the baby up for adoption, "[h]e would fight and he would lose."  (Ex. H at 25:23 to 26:4);

z.       "It's important not to take support from [the birth father]. . . . "Don't accept any support from him."  (Ex. H at 26:10-11, 15-16);

aa.       You will be required to sign a birth father affidavit that includes a

statement that he's not supporting you in any way during the pregnancy; you need to tell the truth.  (Ex. H at 26:18 to 27:6); and

      bb.   "I've done 1,239 adoptions."  (Ex. H at 32:3).

        **Interviews With Other Utah Adoption Agencies.**

     97.     Other Utah licensed child-placing agencies which Hardy and/or Jenkins have represented on a variety of occasions, engage in a regular practice of enticing out-of-state birth mothers to come to Utah for the sole purpose of giving birth to their children in this state, 24 hours thereafter convincing them to relinquish their rights and placing their children for adoption, then returning birth mothers to their home state, at all times encouraging birth mothers to keep out-of-state birth fathers "in the dark" about what the agencies and birth mothers are doing, and all as part of an ill-conceived scheme designed to prevent birth fathers from exercising their parental rights and otherwise timely objecting to the adoption of their children.  As a brief summary of the transcripts from the other two agencies, further evidence of the adoption "scheme" outlined above includes the following (Exhibits J and K):

      a.  Financial and living arrangement incentives include help with her living expenses; apartment complex, "we put our gals up in, they get their own furnished apartment." We pay for all their expenses while they are out here; R. 155[11]; we have housing here in Utah; "we help our girls all the time that need to get away from where they're at... so that's not a problem...." R. 154;

---

    [11]Pages numbers in this section refer to the pages numbers in Exhibits J and K.

b.  The birth mother wants to know if the UBF can prevent her from giving the baby up for adoption, that's her biggest [concern]; NO HE CAN'T; R. 154;

c.  She does not have to tell him that she is coming to Utah; R. 153; the UBF doesn't have to know that the birth mom leaves and she comes somewhere else and does something else; R. 141;

d.  "If he's going to just be a total pain in the butt then we can definitely, just not have him involved at all."  R. 153;

e.  She can just get on a plane and come out and he can't do anything about it; we'll usually do "like a general notice, ad or whatever, like in the, ya know, how like in the back of the paper or whatever .... so there's technically, we tried to notify him type of thing." [Laughing...] But who reads those, right?  EXACTLY; R. 153;

f.  Regarding if he can just hop on a plane and come out to Utah, she doesn't want any nasty surprises..."There's a ton of, there's quite a few agencies in Utah. . . ."; R. 152;

g.  Regarding what does the notice say [on hold, while checks]; "Okay.  Alright. It is.  So. Good news.  So.  Apparently umm...if she comes to Utah, like before she actually delivers, which obviously she is probably planning on doing...(Right)  then we don't even need to post in Maryland.  So, ummm...we won't even have to notify him at all.  Only if they're coming out to Utah after they deliver and placing the baby do we have to post."  R. 151-52;

h.  "So if she's already [in Utah] and has the baby here then she doesn't have to tell him she's coming, she doesn't have to tell him anything, she can just disappear." R. 151; "So her

best bet, if that, if she wants to get away and get apart from that would be to obviously come here." R. 143;

  i.  Like said if she chooses not to identify him on the birth certificate "then we don't even have to deal with him." R. 151;

  j. We deal with birth fathers all the time that try and it just doesn't pan out for them because Utah laws are so protective of the birth mom; R. 151;

  k.  By the time he got anything going, it takes so many months, getting anything going, that the placement would already be finalized and he wouldn't stand a chance anyway; R. 151; the birth mother could go back to Maryland and get into trouble, "but the thing is, it's already done and it's already signed and it's legal and so..." R. 141;

  l.  There's a deadline...he can't come back a year later...it's like 24 hours, really soon after the birth; R. 151;

  m.  So even if she were to come to Utah today, and then by the time if he started filing papers today, the chances of him getting papers filed to the court on time are like so remote, "unfortunately the court systems take forever, or fortunately in this case . . . ."; R. 150-51;

  n.  Any attorney knows that Utah laws are so strict, "it would probably be just like, `Dude, you're hosed,' ya know what I mean..." R. 150;

  o.  Regarding whether he wants to parent the child...he wants to have the baby, wants to be a dad, wants to pay for the baby's expenses, and pay to get married, and the birth

mother is like "I love you dude, but I don't want to marry you, and I don't want to have a baby with you." R. 150;

        p.   Literally over 99% of the time the guys just mouth off and then find out they're going to have to pay $30,000 in legal fees, and they're like never mind; it's like they're almost doing it more to be a jerk to the birth mom, depending on the situation, but then they find out how much it's going to be and they're like okay never mind; R. 150;

        q.   It was temporary for her, but he thought it was more permanent..."Well, she won't have to worry about him.  Let's just put it that way."  R. 150;

        r.   We hardly have one UBF that is cooperative, so we deal with it all day every day, so that's not even an issue; R. 149;

        s.   We pay for her way to come to Utah and to send her back to Maryland; R. 149;

        t.   We pay her final placement money too; "it's money to kind of help her get back on her feet after placement . . . It's usually about $3,000." R. 149; She would go home with money in her pocket, so she would have 6 weeks covered; R. 143;

        u.   We need to give him 20 days notice, and then once she signs papers after the baby's born if that 20 days has passed then his rights are terminated; what we try to do about 30 days out, give us that leeway if she is early, he still has the 20 days even if it's post delivery; so it's 20 days from when she tells him; R. 142;

        v.   We don't tell him that he has to come to Utah and file, we just tell him that it will all go down in Utah, and then if he's really responsible as he says he's going to be in raising a

child, then he needs to go to work and figure out what to do; R. 129;

> w.  "And so many of these guys are such dead beats they just you know think that they can scream and holler and don't place the baby and then the poor birth mom is stuck." R. 129; "It's hard to say if he's going to bark really loud and not bite and which ones are going to bite."  A lot of times they get their mothers behind them pushing and pushing; R. 131;

> x.  Agency gets "a million calls a day...." R. 128;

> y.  You can notify the UBF of your intentions to come to Utah any way you want, but just need to show that he knew, whether by certified mail, text, or email, or whatever; R. 126.[12]

## *Facts Pertaining to Joint and Several Liability*

98.  Morelock and Byingtons are jointly and severally liable for the wrongful, illegal, and fraudulent acts of each other for the reason that they are relatives, were acting as agents of one another, and/or were co-conspirators in committing the actionable conduct set forth herein.

---

[12]In the first round of interviews in 2011, one of LDS Family Services adoption agency interviews suggested that there were no major forum shopping, birth mother coaching, or Fraud Immunity issues.  In specific instances, however, LDS Family Services has engaged in questionable if not illegal conduct, and on information and belief, opposed to any meaningful mandatory notice to birth fathers, and is at a minimum tacitly complicit with unethical, wrongful, and even fraudulent conduct perpetrated upon unmarried biological fathers by biological mothers, which is being facilitated by Fraud Immunity.  One specific instance of LDS Family Services being a party to fraudulent conduct was in the Strickland case (on appeal as set forth above) in which the LDS Family Services representative coerced a married non-biological father ("legal father") to sign a consent to an adoption, and when he indicated to the agency representative that the actual biological father was expecting to co-parent with the biological mother, the representative told the legal father to "keep [his] mouth shut" about the mother's true intentions.  Brief of Appellant Strickland at 21-22, Exhibit L thereto.

99.     Hardy and Jenkins are jointly and severally liable for the wrongful, illegal, and fraudulent acts of each other for the reason that they are so closely related in their law practices both generally and specifically pertaining to this case, were effectively acting as agents of one another at various times in the Utah and Colorado proceedings, and/or were (or became) co-conspirators in committing the actionable conduct set forth herein.

100.     Hardy and Jenkins are, moreover, jointly and severally liable for the wrongful, illegal, and fraudulent acts of Morelock and Byingtons, for the reason that they were aware of the fraudulent conduct of them (at least after the conduct occurred, and on information and belief before it occurred by informing them of what they could do to cut off Manzanares' paternity rights), and further that they personally and professionally perpetuated the fraudulent conduct of their clients, acting as agents of their clients, and by attempting to use Fraud Immunity to permit their clients to go forward with and finalize an otherwise illegal adoption, and then for their clients to forever retain the perceived benefits of the illegal adoption, to wit: the Minor Child remaining in the permanent custody of Byingtons, and Morelock retaining the ability to visit and/or share physical custody of the Minor Child.

101.     WC, WJ, and KMLF are all jointly and severally liable for the wrongful, illegal, and fraudulent conduct of Hardy and Jenkins, as their employees, as their agents and representatives, and/or further pursuant to the legal doctrine of respondeat superior.

### *Additional General Allegations*

102.     Defendants acting in concert, and as part of a conspiracy, with each other,

coordinated their actions so as to unlawfully and illegally deprive Manzanares of his parental rights to the Minor Child.

103.    Defendants at all times participated, in one manner or another, in a coordinated scheme to deceive Manzanares, to have the Minor Child born in Utah and expeditiously placed for adoption in Utah without Manzanares' knowledge and consent, and in direct contradiction of his express wishes, and further in direct contradiction to Colorado court orders and proceedings.

104.    Defendants' scheme was designed for the sole purpose of getting around Colorado laws that would otherwise apply to custody and paternity issues pertaining to the Minor Child.

105.    Defendants' scheme was designed to avoid giving Manzanares any real or meaningful notice of Utah court proceedings, and to otherwise prevent him from more timely taking legal action in Utah.

106.    The scheme that was carried out by Defendants' individual and collective actions (and omissions), which are also set forth above include but are not limited to the following:

    a.    Conceiving of and planning the scheme that would involve Morelock leaving the state of Colorado, for the sole purpose of getting around Colorado laws that required obtaining Manzanares' consent to any adoption;

    b.    Concealing the scheme from Manzanares, such as when Morelock wrote him the January Email, when Morelock communicated with the Colorado court and failed to disclose her signing (or intent to sign) a "Consent to Adoption" in Utah, and/or when Morelock and other Defendants engaged in other parts of their scheme;

36

       c.      Causing to be filed in Utah an adoption petition, temporary custody documents, and other court pleadings, without any notice to Manzanares, and without disclosing at any relevant time, the state of Colorado Court proceedings;

       d.      Causing the birth of the Minor Child to be prematurely induced, and concealing the Minor Child's birth for a period of weeks;

       e.      Causing the Consent to Adoption and other Utah court proceedings to be completed in an expedited fashion, rushing them through "the system", including having them signed by a judge (Judge Hilder) who was not even assigned to the case, when Manzanares had already filed his Colorado paternity action (on January 13, 2008) more than six (6) weeks before the Utah court proceeding, with which Defendants moved forward nearly four (4) weeks after Morelock was served with the Colorado Paternity action (on February 1, 2008);

       f.      Using a variety of telephone, mail, and wire communications, to plan their scheme, and to carry it out, including all communications set forth and described above, the January Email, communications among and between the various Defendants beginning in November 2007 (and perhaps earlier), up to and including present and ongoing communications orchestrated to keep the Minor Child from Manzanares; and

       g.      Engaging in the other fraudulent, unlawful and/or wrongful conduct set forth above, and additional conduct Plaintiffs expect to identify through the course of discovery.

    107.    Defendants' course of conduct was intentional, reckless, and/or showed a callous disregard for the rights of Plaintiffs.

## I.  <u>FIRST CAUSE OF ACTION</u>

(RICO Violations – All Defendants)

108.  Plaintiffs reallege all matters contained in paragraphs 1 through 107 above as though fully set forth herein.

109.  The parental rights divestment scheme conceived, developed, promoted and carried out by Defendants individually and/or through their concerted co-conspirator efforts, directly and indirectly, constitutes a violation of the Racketeering Influenced and Corrupt Organizations Act ("RICO")(18 U.S.C. § 1961, et. seq.) for many reasons, including but not limited to the following:

a.  Defendants are persons as defined under RICO, because they are individuals or entities capable of holding a legal or beneficial interest in property (18 U.S.C. § 1961(3));

b.  Defendants were employed by or associated with an enterprise as defined under RICO, because they are individuals, partnerships, corporations, associations, or other legal entities, or alternatively are a union or group of individuals associated in fact although not a legal entity (18 U.S.C. § 1961(4)), insofar as they:

I.  Invested proceeds from their pattern of racketeering activity into their enterprise;

ii.  Acquired or maintained an interest in, or control over, the enterprise through the pattern of racketeering activity;

iii.  Conducted or participated in the affairs of the enterprise through

38

the pattern of racketeering activity; and/or

      iv.      Conspired to do one or more of the above;

      c.      Defendants' wrongful conduct included numerous violations of state and federal laws, including at least two (2) acts of racketeering activity, which therefore constituted a pattern of racketeering activity, as defined under RICO (18 U.S.C. § 1961(1) and -(5)), as set forth above, which conduct included but is not limited to the following acts of racketeering activity:

      I .      The act or threat involving kidnapping, as a result of seizing confining, detaining, and/or transporting the Minor Child without Manzanares' consent, chargeable under Utah law and punishable by imprisonment for more than one year (Utah Code Ann. § 76-5-301.1);

      ii.      The act or threat of robbery, as a result taking or attempting to take property personally belonging to Plaintiffs, against their will and with the intent to deprive them permanently thereof, chargeable under Utah law and punishable by imprisonment for more than one year (Utah Code Ann.§ 76-3-301);

      iii.      Numerous acts indictable as mail fraud (18 U.S.C. § 1341), including that: Defendants having devised or intended to devise a scheme or artifice to defraud Plaintiffs, deposited or caused to be deposited in the Postal Service or other private or commercial interstate carrier, a matter or thing to be delivered in furtherance of the scheme or artifice to defraud;

      iv.      Numerous acts indictable as wire fraud (18 U.S.C. § 1343),

including that: Defendants having devised or intended to devise a scheme or artifice to defraud Plaintiffs, transmitted or caused to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, pictures or sounds for the purpose of executing such scheme or artifice to defraud;

      v.      Numerous acts indictable as trafficking in persons (18 U.S.C. § 1590), including that: Defendants knowingly recruited, harbored, transported, provided, and/or obtained by unlawful means, the Minor Child for third parties;

      vi.      Numerous acts of interference with commerce (18 U.S.C. § 1951);

      vii.      Numerous acts indictable as interstate transportation of stolen property (18 U.S.C. § 2314 and § 2315);

      viii.      Participating in the felony sale of a child under Utah state law (Utah Code Ann. § 76-7-203);

      ix.      Conspiring with other individuals and/or entities as set forth above;

      x.      Engaging in the fraudulent conduct outlined above, including but not limited to affirmative misstatements of material fact, and omissions of material fact intending to deceive Manzanares;  and

      xi.      Engaging in other wrongful predicate acts that will be identified in the course of discovery.[13]

---

[13]Defendants' pattern of racketeering activity satisfies relevant U.S. Supreme Court precedent, including the continuity-plus-relationship test, insofar as their pattern of activities "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events."  *H.J. Inc.*

d.      The Defendants' enterprise engaged in or affected interstate commerce, including but not limited to interstate travel, lodging, payment by Utah residents for medical and other services rendered in Utah, and numerous other aspects of interstate commerce;

e.      Defendants operated or managed the enterprise through a pattern of racketeering activity, including but not limited to any act or threat involving the wrongful conduct set forth in subparagraph c immediately above, and other paragraphs set forth above;

f.      Plaintiffs were injured in their persons, business, and/or property as a result of Defendants' pattern of racketeering activity; and

g.       For numerous other reasons that Plaintiffs expect to identify in the course of discovery.

110.    Defendants have therefore engaged in unlawful activities under RICO, including but not limited to:

a.      Acquiring or maintaining, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect interstate or foreign commerce through a pattern of racketeering activity (18 U.S.C. § 1962(b));

b.      Conducting or participating, directly or indirectly, in the conduct of an enterprise's affairs through a pattern or racketeering activity which affects interstate or foreign

---

*v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 240 (1989).  The continuity of some of Defendants' conduct may be closed-ended as to some their pattern of racketeering activities (e.g. conclusion of Utah Court proceedings in the underlying adoption matter), however, the continuity of Defendants' racketeering is open-ended as to other of their pattern of racketeering activities (e.g. perpetuating their wrongful conduct through ongoing Colorado child custody proceedings).

commerce (18 U.S.C. § 1962( c ));

        c.     Conspiring to violate the foregoing RICO provisions (18 U.S.C.

§ 1962(d)); and

        d.     Engaging in other activities unlawful under RICO that Plaintiffs expect to

identify during discovery.

      111.    As a direct and proximate result of Defendants' wrongful and illegal conduct

which violated RICO, Plaintiffs suffered extensive special and general damages (including

property and economic damages) in an amount to be proven at trial, as well as treble damages

consistent with 18 U.S.C. § 1964( c ).

      112.    Under RICO, Plaintiffs are entitled to reimbursement of their reasonable

attorneys' fees and costs incurred in pursing this action consistent with 18 U.S.C. § 1964( c ).

## II.  <u>SECOND CAUSE OF ACTION</u>

(Utah's Pattern of Unlawful Activity Act – All Defendants)

      113.    Plaintiffs reallege all matters contained in paragraphs 1 through 112 above

as though fully set forth herein.

      114.    The scheme developed, promoted, and carried out by Defendants individually

and/or through their concerted efforts, constitutes a violation of Utah's Pattern of Unlawful

Activity Act, § 76-10-1601, et. seq., for all of the following reasons:

        a.     Defendants are associated in a scheme or artifice to defraud that

constitutes an enterprise consistent with Utah Code Ann. § 76-10-1602(1);

        b.     Defendants' enterprise engaged in a pattern of unlawful activity as defined

in Utah Code Ann. § 76-10-1602(4)(m)(kidnapping), Utah Code Ann. § 76-10-
1602(4)(t)(robbery), Utah Code Ann. § 76-10-1602(4)(v)(theft by deception), Utah Code Ann. §
76-10-1602(4)(qq)(sale of a child), Utah Code Ann. § 76-10-1602(4)(yy) and/or -
1602(4)(zz)(false or inconsistent statements), Utah Code Ann. § 76-10-1602(4)(aaa)(written false
statements), Utah Code Ann. § 76-10-1602(4)(eeee)(communications fraud), Utah Code Ann. §
76-10-1602(4)(iiii)(any act illegal under 18 U.S.C. Section 1961(1)(B), ( C ), and (D), by
engaging in numerous acts prohibited by established law, including those acts detailed and
described more fully above; and

        c.     For numerous other reasons that Plaintiffs expect to identify in the course
of discovery.

     115.    Plaintiffs acted at relevant times in reasonable reliance upon Defendants
misstatements and omissions, and in ignorance to their falsity.

     116.    If Plaintiffs had known the truth, i.e. if Defendants had fairly and honestly
represented their intentions and if Defendants had not omitted key information relating to the
scheme, Plaintiffs would have taken otherwise appropriate action to prevent the potential
deprivation of paternal rights to the Minor Child.

     117.    As a direct and proximate result of Defendants' wrongful and illegal conduct,
Plaintiffs suffered extensive special and general damages in an amount to be proven at trial.

     118.    Defendants are jointly and severally liable to Plaintiffs for the extensive special
and general damages they have sustained, and for reimbursement of their reasonable costs and
attorneys' fees incurred in pursuing this action.

119.    Defendants had actual knowledge of their wrongful and illegal actions, including the misrepresentations of material facts and omissions of material facts, and therefore engaged in a course of conduct that was intentional, reckless, and showed a callous disregard for the rights of Plaintiffs, accordingly rendering Defendants liable to Plaintiffs for a sum twice the amount of damages sustained by Plaintiffs, together with interest and reasonable costs and attorneys' fees.

### III. THIRD CAUSE OF ACTION

(Misrepresentation/Fraud – All Defendants)

120.    Plaintiffs reallege all matters contained in paragraphs 1 through 119 above as though fully set forth herein.

121.    As part of a systematic scheme to deceive and mislead Plaintiffs, Defendants repeatedly engaged in conduct involving false pretenses, false representations, actual fraud, and/or engaging in omissions of material fact.

122.    Defendants' fraudulent conduct includes, but is not necessarily limited to all misrepresentations and omissions of material fact set forth in detail above, including but not necessarily limited to: misrepresentations (and/or material omissions of fact) to Plaintiffs; fraud upon the Utah Court and the Colorado Court for failure to disclose Morelock's true intentions, her signing of a relinquishment of her rights; defrauding, misleading, and deceiving Manzanares regarding the nature of her intended visit to Utah (to give birth and place the Minor Child for placement for adoption without the knowledge and consent of Manzanares); engaging in such fraudulent, misleading, and deceiving conduct with the aid, advice, counsel, and knowledge of Jenkins and/or Hardy; and engaging in other false, fraudulent, and other wrongful conduct set

44

forth more fully above.

123.     At the time of the misrepresentations, Defendants were acting individually, collectively, and in concert with each other,  in bad faith, and with the intent to deceive and defraud Plaintiffs.[14]

124.     Defendants knew or should have known that said representations were false and fraudulent at the time they were made.

125.     Defendants made such false and fraudulent representations for the purpose of inducing Plaintiffs to rely thereon to their detriment.

126.      Plaintiffs, at the time said representations were made, had no knowledge of their falsity, but believed them to be true.

127.     Plaintiffs reasonably and justifiably relied on said representations.

128.     Based upon Defendants' numerous misrepresentations, Plaintiffs were induced into taking no further action to protect Manzanares rights, other than what he did in Colorado, and his rights to the Minor Child were ostensibly automatically terminated in the Utah state district court as a result of the misrepresentations and/or omissions of Defendants.

129.     Defendants pursued said course of conduct intentionally, maliciously, fraudulently, oppressively, and in conscious disregard of the rights of Plaintiffs.

---

[14]The fraudulent conduct of at least some of the defendants has already been recognized by the Utah Supreme Court, as discussed in its published opinion and in the trial court, and is arguably res judicata on such issues, leaving this Court merely to determine the amount of damages incurred as a result of the Defendants' fraudulent conduct.   *See In re Baby B,* 270 P.3d 486 (Utah 2012).

130.     As a result of Defendants' misrepresentations and omissions of material fact,

Plaintiffs have sustained special, general, punitive, and consequential damages in an amount that

will be proven at trial, exclusive of attorneys' fees, costs, and interest.

### IV.  FOURTH CAUSE OF ACTION

(Negligent Misrepresentations)

131.     Plaintiffs reallege all matters contained in paragraphs 1 through 130 above

as though fully set forth herein.

132.     As an alternative cause of action, all Defendants had duties of honesty, integrity

and candor before the courts in Utah and Colorado, which they all breached, resulting in

Defendants negligently making the false representations and/or negligent omissions of material

fact set forth above, expecting Plaintiffs to rely and act thereon.

133.     Defendants are therefore liable to Plaintiffs, based on their negligent

misrepresentations and/or omissions, for all special, general, and consequential damages in an

amount to be proven at trial, exclusive of attorneys' fees, costs of collection, interest, and any

applicable penalties.

### V.  FIFTH CAUSE OF ACTION

(Theft -- Conversion -- Misappropriation -- All Defendants)

134.     Plaintiffs reallege all matters contained in paragraphs 1 through 133 above as

though fully set forth herein.

135.     Defendants, without authorization, misappropriated, took, converted, assumed and

exercised the right of ownership, dominion, and control over Plaintiffs' interests, ostensibly to the

exclusion of his right of ownership, dominion, and control over such interests, thereby depriving Plaintiffs of same, and thereby retaining such interests for their own benefit and/or gain.

136.    As a result of Defendants' theft, conversion, and/or misappropriation, Defendants are therefore liable to Plaintiffs for all special, general, and consequential damages in an amount to be proven at trial, exclusive of attorneys' fees, costs of collection, interest, and any applicable penalties.

## VI.   SIXTH CAUSE OF ACTION

(Civil Conspiracy -- All Defendants)

137.    Plaintiffs reallege all matters contained in paragraphs 1 through 136 above as though fully set forth herein.

138.    All Defendants are a combination of business entities and/or individuals acting in concert for the object and purpose of defrauding and/or committing various wrongful acts against Plaintiffs.

139.    Upon information and belief, all Defendants have agreed, and pursuant to such agreement, have acted in a manner so as to harm and/or injure Plaintiffs, defraud Plaintiffs, and otherwise engage in all other wrongful and illegal conduct set forth more fully above. Accordingly, the act of one Defendant is attributable as a matter of law to the other Defendants as they acted individually and/or in concert to carry out the common goal of accomplishing the wrongful acts set forth herein.

140.    As a direct and proximate result of Defendants' civil conspiracy, Plaintiffs have been injured and damaged in sums to be proven at trial.

141.     In addition to compensatory damages, Plaintiffs seek an award of punitive damages which the Defendants should be required to pay in an amount, to be determined at trial, sufficient to punish Defendants and deter future similar conduct, and in no event less than $100 million.

## VII.  SEVENTH CAUSE OF ACTION

(Intentional Infliction of Emotional Distress – All Defendants)

142.     Plaintiffs reallege paragraphs 1 through 141 above as though fully set forth herein.

143.     Defendants knew or should have known that through their actions and omissions, Plaintiffs would suffer severe emotional trauma.

144.     Defendants pursued an outrageous course of conduct, as outlined above, intentionally and/or recklessly, proximately causing severe emotional distress, shock and other painful emotions to Plaintiffs.

145.     Defendants are therefore liable to Plaintiffs for all special, general and consequential damages resulting therefrom, and for exemplary damages as set forth above.

## VIII.  EIGHTH CAUSE OF ACTION

(Negligent Infliction of Emotional Distress – All Defendants)

146.     Plaintiffs reallege paragraphs 1 through 145 above as though fully set forth herein.

147.     Defendants had a duty to conduct themselves so as to avoid negligently causing Plaintiffs emotional distress and other damages and/or injuries.

148.     Defendants breached said duty as set forth above, which resulted in Plaintiffs suffering emotional distress, which proximately resulted in Plaintiffs suffering special, general

48

and consequential damages.

## IX.  NINTH CAUSE OF ACTION

(Wrongful and Tortious Interference with Parental Rights -- All Defendants)

149.    Plaintiffs reallege paragraphs 1 through 148 above as though fully set forth herein.

150.    Manzanares has parental rights to, and in, his relationship with his daughter, the Minor Child, just as the Minor Child has rights to a relationship with her father.

151.    The rights of a biological father to develop and maintain a relationship with his child is a core fundamental right, guaranteed by the United States Constitution as interpreted by the United States Supreme Court and federal law.

152.    Manzanares' rights have previously been recognized by the Utah Supreme Court. *See In re Baby B,* 270 P.3d 486 (Utah 2012).

153.    Defendants, as outlined and set forth above, wrongfully, illegally, and tortiously interfered with Manzanares' rights, and then engaged in a course of conduct to aid, abet, maintain, perpetuate and preserve the results of their unlawful conduct.

154.    Manzanares has consistently demonstrated a full commitment to the responsibilities of parenthood, as recognized and evidenced by all court proceedings in both Utah and Colorado.

155.    Manzanares' commitment has included, but is not limited to, an ability to participate in the rearing of his daughter, his interest in personal contact with, visitation, and/or custody of his daughter.  All such interests acquire substantial protections under state and federal constitutions.

156.    Manzanares has consistently demonstrated his full commitment to parenting responsibilities by: attempting to be involved in the birth of his daughter; offering to raise his daughter with Morelock, or on his own if necessary; providing support and/or offering to provide support for medical treatment and any other financial needs arising from and/or relating to the pregnancy and/or delivery of the Minor Child; formulating a plan regarding the best interests of the Minor Child, and to undertake everything he needed and could reasonably be expected to do to develop a care giver and custodial relationship with the Minor Child.

157.    All Defendants had knowledge and/or were aware that Manzanares was the biological father of his daughter, the Minor Child, and therefore he should have been, and in fact has not been accorded certain rights as the father of the Minor Child.

158.    Notwithstanding this knowledge and awareness, Defendants intentionally and willfully used improper, illegal, unethical, deceptive, and fraudulent means and methods with the specific intent to preclude Manzanares from establishing a parental relationship with his daughter, the Minor Child, and to further interfere with those parental rights through protracted litigation in Utah and Colorado, all with the wrongful aim of depriving Manzanares of his legitimate and constitutionally-protected  parental rights.

159.    The conduct of Defendants, individually and collectively, has resulted in the violation of Manzanares' rights which has proximately caused special, general, and punitive damages in an amount that will be established at the time of trial, and shall not be less than $120 million.

## X.  **TENTH CAUSE OF ACTION**

(Assault, Battery, Kidnapping and False Imprisonment – All Defendants)

160.   Plaintiffs reallege paragraphs 1 through 159 above as though fully set forth herein.

161.   Defendants, acting individually and collectively, and through a scheme of misrepresentation, deception, and fraud, and without any legal justification or excuse for doing so, seized, took, transplanted and secreted away the Minor Child from Manzanares with the intent of depriving him of his parental rights, and further depriving the Minor Child of her personal liberty to acquire, establish, and maintain a parental relationship with her biological father, Manzanares.

162.   None of the actions of Defendants were taken in the best interests of the Minor Child, but rather were improperly, illegally, and unethically taken ostensibly for the benefit of each and all of the Defendants, depending upon the self-serving interests of each.

163.   All actions of the Defendants, individually and collectively, were designed with the sole purpose of keeping Manzanares' daughter, the Minor Child, away from him, so that he would never be able to establish and maintain a parent-child relationship with his daughter.

164.   The wrongful taking of the Minor Child from Manzanares constitutes a kidnapping, and further constitutes an assault and battery against her person, as well as wrongful imprisonment.

165.   The separation from Manzanares to date, has resulted in damages and injuries to the Minor Child and Manzanares.

## XI.  ELEVENTH CAUSE OF ACTION

(Constructive Fraud -- All Defendants)

166.    Plaintiffs reallege paragraphs 1 through 165 above as though fully set forth herein.

167.    As an alternative cause of action, Defendants innocently or negligently made the false representations set forth above, expecting that Manzanares, acting individually and on behalf of the Minor Child, would rely on those misrepresentations, and act thereon.

168.    Defendants are therefore individually and collectively liable to Plaintiffs for all damages sustained by Plaintiffs.

## XII.  TWELFTH CAUSE OF ACTION

(Punitive Damages -- All Defendants)

169.    Plaintiffs reallege paragraphs 1 through 168 above as though fully set forth herein.

170.    Defendants' acts and/or omissions were the result of a willful and maliciously or intentionally fraudulent conduct which manifested a knowing and reckless indifference toward, and a disregard of, the rights of others.

171.    Plaintiffs are therefore entitled to an award of punitive or exemplary damages to deter similar conduct in the future in an amount that will be proven at trial, and which shall not be less than $100 million.

## XIII.  THIRTEENTH CAUSE OF ACTION

(Reservation To Amend)

172.    Plaintiffs reallege all matters contained in paragraphs 1 through 171 above as though fully set forth herein.

173.     Plaintiffs anticipate that discovery may reveal other potential causes of action against Defendants, their principals, agents, representatives, or other persons or entities, and therefore reserve the right to amend this pleading to bring such additional causes and include additional party defendants.

## JURY DEMAND

Plaintiffs hereby demand that all issues so triable be tried to a jury, and hereby tender to the Court the requisite jury demand fee.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1.     General, special, and general damages in an amount that shall be proven at trial, and that shall in no event be less than $20 million;

2.     Equitable and/or declaratory relief as may be appropriate under the circumstances;

3.     For an award of reasonable attorneys' fees and costs of collection;

4.     Punitive damages in an amount sufficient to deter similar conduct in the future, which shall in no event be less than $100 million;

5.     Doubled or trebeled damages consistent with the allegations set forth above; and

6.     Such other and further relief as the Court deems just and proper under the circumstances.

DATED this __17th__ day of February, 2014.

THE HUTCHINS LAW FIRM, P.C.

*/S/ Wesley D. Hutchins*

Wesley D. Hutchins
***Attorney for Plaintiffs Robert Benito
Manzanares and K.M.***

## **VERIFICATION**

   I hereby certify that I read the foregoing **VERIFIED COMPLAINT**, and all of the factual statements contained therein are true and accurate to my best knowledge, information, and belief.

   DATED this __17th_ day of February, 2014.


              _/S/ Robert Benito Manzanares_
              Robert Benito Manzanares (personally)


              _/S/ Robert Benito Manzanares_
              Robert Benito Manzanares (for and on
              behalf of my minor child K.M.)


   SUBSCRIBED TO AND SWORN TO before me on this __17th_ day of February, 2014.


              _/s/_
[official stamp in original]       NOTARY PUBLIC